# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: October 2, 2020

```
* * * * * * * * * * * * * * * * * *
NAOMI ENGEL,                      *        UNPUBLISHED
                                  *
                                  *        No. 16-1145V
                Petitioner,       *
v.                                *        Special Master Gowen
                                  *
SECRETARY OF HEALTH               *        Finding of Fact; Onset;
AND HUMAN SERVICES,               *        Influenza ("flu") vaccine;
                                  *        Shoulder Injury Related to Vaccine
                Respondent.       *        Administration ("SIRVA")
* * * * * * * * * * * * * * * * * *
```

*Amy A. Senerth,* Muller Brazil, LLP, Dresher, PA, for petitioner.
*Althea W. Davis,* U.S. Dept. of Justice, Washington, D.C., for respondent.

## FINDING OF FACT[1]

On September 15, 2016, Naomi Engel ("petitioner") filed a petition under the National Vaccine Injury Compensation Program (the "Vaccine Act" or the "Vaccine Program").[2] Petitioner alleges that as a result of receiving an influenza ("flu") vaccination on September 22, 2013, she developed left shoulder injuries. Petition at Preamble (ECF No. 1).

After carefully considering the testimony, the medical records and the affidavits filed in this case, I find that petitioner has established that the onset of her left shoulder injuries occurred within forty-eight hours of receiving the flu vaccination on September 22, 2013.

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. §3501 note (2012), **because this ruling contains a reasoned explanation for the action in this case, I intend to post it on the website of the United States Court of Federal Claims.** The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. Before the ruling is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). "An objecting party must provide the court with a proposed redacted version of the decision." *Id.* **If neither party files a motion for redaction within 14 days, the ruling will be posted on the court's website without any changes.** *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to 34 (2012). All citations in this decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

## I.      Procedural History

On September 15, 2016, petitioner filed a petition in the Vaccine program, alleging that she developed left shoulder injuries after receiving a flu vaccination.  This case was assigned to the Special Processing Unit ("SPU") for consideration.

On April 12, 2017, respondent filed his Rule 4(c) report, recommending against compensation.  Respondent's ("Resp.") Report ("Rept.") at 1 (ECF No. 26).  Specifically, respondent stated that petitioner's allegation of onset is not substantiated by the medical records. Resp. Rept. at 8.  Respondent stated that petitioner did not seek medical care for her left shoulder pain until five months after receiving the flu vaccination.  *Id.* at 7.  Additionally, respondent stated that petitioner sought medical treatment form her primary care physician, without mentioning left shoulder pain.  *Id.*

After a status conference held on July 20, 2017, petitioner was asked to file a supplemental notarized affidavit, answering a series of questions related to the onset of petitioner's left shoulder injury.  *See* Scheduling Order (ECF No. 32).  Petitioner filed a supplemental affidavit on August 7, 2017.  Another status conference was held on August 30, 2017 with the parties and an OSM staff attorney.  Former Chief Special Master Dorsey recommended that petitioner either file a motion for a dismissal decision or a ruling on the record.  Scheduling Order, issued Sept. 7, 2017 (ECF No. 34).  On November 3, 2017, petitioner filed a status report requesting that the case be transferred out of the SPU.  Petitioner's ("Pet.") Status Rept. (ECF No. 36).  This case was re-assigned to my docket the same day.  Order Reassigning Case (ECF No. 37).

I held a status conference on December 21, 2017, where I requested petitioner file additional support for her claim.  Scheduling Order (ECF No. 39).  On February 1, 2018, petitioner filed an affidavit from Mr. Mark Culmer.  Pet. Exhibit ("Ex.") 12.  The parties then engaged in unfruitful settlement discussions.  *See* Scheduling Order (ECF No. 50).

A fact hearing was set for December 10, 2018.  Hearing Order (ECF Nos. 54-5).  A fact hearing was held via video conference on December 10, 2018 where petitioner and Mr. Mark Culmer testified.  The fact hearing was continued on July 14, 2019 via videoconference where petitioner's primary care physician, Dr. Camille Goff, M.D. testified.  Hearing Order (ECF No. 95).

After the fact hearing, respondent filed a motion for a factual ruling regarding the onset of petitioner's left shoulder injury.  Resp. Post-Hearing Brief (ECF No. 111).  Petitioner filed a post-hearing brief on December 2, 2019.  Pet. Post-Hearing Brief (ECF No. 112).  Respondent filed a reply to petitioner's post-hearing brief.  Resp. Reply (ECF No. 114).

This matter is now ripe for adjudication.

## II.     Legal Standards Regarding Fact Finding

The process for making determinations in Vaccine Program cases regarding factual issues

begins with consideration of the medical records, which are required to be filed with the petition. §11(c)(2). The Federal Circuit has made clear that medical records "warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d at 1528. Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). *Cucuras*, 993 F.2d at 1528.

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19.

The Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (*citing Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### III.   Summary of Evidence Submitted

#### a.   Medical Records

Petitioner received the flu vaccination September 22, 2013 at a Walgreens in Houston, Texas. Pet. Ex. 4. According to the record, the vaccination was an intramuscular injection, administered to petitioner's left deltoid. *Id.*

On September 27, 2013, petitioner had a follow-up appointment with Dr. Brian C. Powers, a urologist, for a post-operative evaluation for a cystoscopy to diagnose and treat a narrowed urethra. The procedure occurred on September 17, 2013.  Pet. Ex. 23 at 4.

Petitioner had an appointment with Dr. Camille Goff, M.D., her family physician, on October 17, 2013.  Pet. Ex. 32 at 2.  At this appointment, petitioner was complaining about ear pain.  *Id.* She was diagnosed with an upper respiratory infection ("URI").  *Id.*

On October 28, 2013, petitioner had an appointment at Texas Institute of Rehabilitation & Sports Medicine with Dr. Camille Goff, M.D.  Pet. Ex. 6 at 1.  At this appointment, it was noted that petitioner presented with ear congestion.  *Id.*  Dr. Goff noted that petitioner's lymph nodes were "slightly swollen," and petitioner's tympanic membranes cloudy.  *Id.* Petitioner was diagnosed with an upper respiratory infection and pharyngitis.  *Id.*  Petitioner was prescribed cipro, Diflucan, and Mucinex.  *Id.*

Petitioner had a phone conversation with Dr. Goff on October 29, 2013 and Dr. Goff noted, "Increased drainage.  Throat was good.  Head with decreased congestion."  *Id.* at 2.

On January 10, 2014, petitioner had an in-person appointment with Dr. Goff.  Pet. Ex. 6 at 3.  Petitioner was diagnosed with an upper respiratory infection after a physical exam.  *Id.* at 3. It was recommended that she continue Cipro and given a Celestone injection in her left deltoid. *Id.;* Pet. Ex. 8 at 1.  Petitioner had a follow-up with Dr. Goff via telephone on January 13, 2014, where petitioner reported that she was "much improved."

On February 20, 2014, petitioner had an in-office appointment with Dr. Goff.  *Id.* at 5. At this appointment, Dr. Goff recorded, "Left arm injection in left deltoid.  Left arm showing impingement.  Full flexion.  External rotation 2+.  Bilateral arm strength 4+. Left biceps tender, abduction to 80 degrees, flexion to 160 degrees.  External rotation is weak."  *Id.* at 5.  Petitioner was diagnosed with a left rotator cuff sprain with impingement.  *Id.*  Dr. Goff's recommended "Therapeutic Interventions" for petitioner's shoulder issue included shoulder exercises; utilize an ergonomic station; and periscapular strengthening.  *Id.*

Petitioner had a telephone follow-up with Dr. Gross on February 26, 2014, where Dr. Goff noted, "Improved. Decreased pain. Moving."  *Id.* at 6.

On July 1, 2014, petitioner had an appointment at Labrada Chiropractic for an evaluation of her left shoulder.  Pet. Ex. 2 at 1.  Petitioner wrote she has been experiencing left shoulder pain since last September 2013 and that it "Began after a flu shot."  *Id.*  The comments section filled out by Dr. Labrada, states, "[Patient] reports L shoulder pain present since Sept. 2013 after having a flu shot.  Physical exam of left shoulder reveals weakness most notable in internal rotation. [Positive] impingement test.  She reports that last week she was reaching overhead to get something off a shelf and that her shoulder began hurting."  *Id.*  In the section filled out by the petitioner, she described her symptoms as "shoulder pain-stiffness-tight-arm pain," and stated that her symptoms started, "After a flu shot."  *Id.* at 2.  Then it appears that petitioner wrote, "reaching overhead to get something off a shelf."  *Id.*  Petitioner reported that she experiences

4

her symptoms, "Constantly (76%-100% of the time). *Id.* at 2.

A physical exam of the left shoulder revealed, "weakness most notable in internal rotation," and a positive impingement test. *Id.* Petitioner began physical therapy at Labrada Chiropractic until October 8, 2014. *Id.* at 16. On October 8, 2014, petitioner reported a "marked improvement." *Id.* Then apparently, petitioner re-started physical therapy on December 2, 2014. *Id.* at 16. It was noted that petitioner "regressed," and getting an MRI of the left shoulder was discussed. *Id.* at 16.

On December 10, 2014, petitioner had an MRI of her left shoulder. Pet. Ex. 3. The MRI revealed that petitioner had moderate supraspinatus tendinosis, a "low-grade delamination type interstitital partial tear involves the supraspinatus tendon, a small nondisplaced tear through the base of posterior superior labrum, and a small fluid collection was present within the subacromial-subdeltoid bursa. *Id.* at 1.

Petitioner had an appointment with Dr. James Mosley, an orthopedic surgeon, for an evaluation of her left shoulder. Pet. Ex. 1 at 2. Dr. Mosley recorded that petitioner's left shoulder pain began after getting a flu shot at a pharmacy. *Id.* He wrote, "She immediately experienced immediate pain and was told by the pharmacist shoulder will be sore for a few days. Patients states pain never went away. She went to see Dr. Camille Goff in 01/2014 had x-rays and was diagnosed with impingement." *Id.* Dr. Mosley noted that petitioner's recent MRI "suggests a [Rotator Cuff Tear] and labral damage." *Id.* During the physical examination of her left shoulder, petitioner demonstrated tenderness of the greater tuberosity, tenderness of the supraspinatus and on the lateral cuff insertion. *Id.* at 4. Petitioner had positive Hawkins, Neers and empty can sign. *Id.* Dr. Mosley diagnosed petitioner with non-traumatic rotator cuff tear; subacromial impingement; and shoulder pain. *Id.* at 4. He recommended petitioner undergo a left shoulder arthroscopy with RCR and SAD. *Id.*

Petitioner also submitted a Vaccine Adverse Event Reporting System ("VAERS") report on December 14, 2014. Pet. Ex. 20. The report includes the date of vaccination of September 22, 2013 and the date of adverse event onset of September 22, 2013. *Id.* at 10. Petitioner described the adverse event as, "Extremely sore arm with limited mobility. Worsened over time. Went to doctor and was diagnosed with Shoulder Impingement. Then, prescribed physical therapy. Pain still exists so had MRI which reveals tears in the base of the superior posterior labrum as well as a low-grade rotator cuff tear in the left shoulder." *Id.*

### b. Affidavits Submitted

Petitioner submitted three affidavits to support her claim and the onset of her injury. In her first affidavit, petitioner stated that immediately following the vaccination she felt severe pain in her left shoulder. Pet. Affidavit ("Aff.") at ¶ 3. She stated that she thought the pain would subside on its own after a few days of conservative treatment, but it only worsened. *Id.* at ¶ 5. Petitioner also stated that she began a new job on September 23, 2013 and was not eligible for her new employer's health insurance until ninety days after the start of her job. *Id.* at ¶ 6. She explained, "I tried and wanted to schedule a doctor's appointment for my significant left shoulder pain, but I could not afford the COBRA payments." *Id.* Petitioner stated, "In January

2014, when I was now eligible for my company's health insurance, I presented to Dr. Camille Goff with complaints of ongoing left shoulder pain since receiving the flu shot." *Id.* at ¶ 7.

In her second affidavit, petitioner stated, "On September 23, 2013, I started a new job at the University of Houston.  I tried to limit the use of my shoulder and continue to treat the pain on my own because, first, I did not want to risk my new position by requiring time off to treat; second I was hoping eventually it would just go away."  Pet. 2nd Aff. at ¶ 6 (ECF No. 21).

In petitioner's third affidavit, she stated that she did not mention her ongoing left shoulder pain at the office appointment with Dr. Goff on October 13, 2013 (or the follow-up conversation on October 29, 2013) because it was not the reason I was seeking treatment from Dr. Goff at the time.  Pet. 3rd Aff. at ¶ 4 (ECF No. 33).  Petitioner reiterated that she had just started her job in September 2013 and "I knew I was not going to take off time and risk my job to undergo any sort of treatment."  *Id.*  Further, petitioner stated that at the January 10, 2014 appointment she mentioned her left shoulder pain to Dr. Goff and "specifically requested the injection administered to me on that date in my right arm."  *Id.* at ¶ 5.

Petitioner also submitted an affidavit by Mr. Mark Culmer, her domestic partner, to support her claim.  Pet. Ex. 12.  He stated that he was on vacation the day petitioner received the flu vaccination, but still in communication with her several times a day.  Pet. Ex. 11 at ¶ 3.  He stated, "I recall her telling me that the shot hurt worse than any shot she ever received and immediately complaining of shoulder and upper arm pain…"  *Id.*  Mr. Culmer recalled, "When I asked her about it several days later, she indicated that the pain in her shoulder and upper arm had not subsided and she was having trouble using her left arm."  *Id.*  He also stated that petitioner "was concerned because she had just started her new job on September 23, 2013 and she could barely lift her arm to get dressed.  She was also concerned with starting a new job and the insurance ramifications…"  *Id.*  He recalled, "When I returned from out of town in early October 2013, I remember having to help her put on a shirt and jacket because she could not rotate her left arm to put her arm in a sleeve."  *Id.*  Mr. Culmer stated that, "[Petitioner] told me she mentioned the shoulder pain to her doctor in autumn of 2013; however, her doctor (who is also my doctor) has a policy of treating only one malady per visit.  Because she was being treated for a sinus infection, nothing was done about her shoulder pain at the time."  *Id.* at ¶ 5. He stated, "Finally, in December 2014, [petitioner] was sent for an MRI which diagnosed a partial tear of the rotator cuff believed to be a direct result of the improperly administered flu shot in the left arm.  I remember [petitioner] being dreadfully upset at this result; however; not surprised because she had suspected that the shoulder had been damaged from the onset of the symptoms in September 2013."  *Id.* at ¶ 6.

### c.  Hearing Testimony

A fact hearing was held on December 10, 2018, where petitioner and Mr. Mark Culmer testified and a supplemental fact hearing was held on July 22, 2019, where Dr. Camille Goff testified.

### 1. Ms. Naomi Engel

Petitioner testified that she received the flu vaccine at a Walgreens on September 22, 2013.  Tr. 7.  She stated that she was sitting when the vaccine administrator, who was standing, gave her the injection.  Tr. 8.  Petitioner stated that immediately after she received the vaccine she felt an "intense sort of burning sensation," and "a radiating sort of pain."  *Id.*  She stated that she had received a flu shot every year and never had any left shoulder injury prior to the September 22, 2013 vaccination.  Tr. 10.

Petitioner testified that she had hoped the pain would go away with conservative treatment.  Tr. 11.  She explained she took ibuprofen and iced her shoulder, hoping it would allow her to resume to normal activities.  *Id.*  Petitioner testified that she told her domestic partner, Mr. Culmer, that she had received the flu shot and it really hurt.  *Id.*

Petitioner explained that on October 28, 2013, she had an appointment with Dr. Goff.  Tr. 12.  When asked why she did not report her left arm pain to Dr. Goff at that appointment, she testified that Dr. Goff "has a policy that you can only come to her with one malady at a time…so mostly I was concerned because I couldn't breathe and I was having sinus issues, so I went for that primarily."  *Id.*  Petitioner also testified that because she was on COBRA, "I was a little worried that if I started to call attention to something then once my insurance kicked in, it would be consider[ed] a preexisting condition and I wouldn't be able to do anything about it."  *Id.*  Petitioner explained that Dr. Goff was extremely fast on the phone during the follow-up call on October 29th and that she could not say for certain that she did not mention her shoulder pain on the follow-up call.  Tr. 13.

Petitioner testified that at the January 10, 2014 appointment with Dr. Goff, she did mention her left shoulder pain.  Tr. 13.  She recalled telling Dr. Goff that she had taken a flu shot in September and her arm was still sore.  *Id.*  However, due to the "one malady" per visit, Dr. Goff focused on the respiratory infection.  *Id.*; Tr. 33. Petitioner testified that she did not recall Dr. Goff administering a Celestone injection in her left arm at this appointment.  *Id.*  She explained, "I don't remember her giving me an injection, but if she did, it would have been in my right arm because I told her my left arm was sore from a flu shot.  She would not have given me a shot in my left arm."  Tr. 13-14.  Petitioner testified that the letter from Dr. Goff, stating that the Celestone injections where administered in her left arm was incorrect.  Tr. 26.  Petitioner stated that she spoke with Dr. Goff about the letter and Dr. Goff indicated that "she normally writes that it would be in the nondominant arm, that's standard procedure for her, and that's why she wrote that."  Tr. 27.

When asked why petitioner waited so long to report her shoulder pain to Dr. Goff, petitioner explained that she was not going to be eligible for health insurance for 90 days and then had to wait until the first of the following month to be able to actually use the insurance.  Tr. 18.  During cross examination, when petitioner was asked if she "delayed seeking treatment out of your concern for health insurance," she responded, "I was afraid that if I went and had someone look at my shoulder and they found that there was something seriously wrong with it, that it would not be covered when my United Healthcare insurance kicked-in in January."  Tr. 112-13.  She explained that her belief that there may have been an issue with a pre-existing

condition was because, "You hear all kinds of horror stories about insurance and what's considered pre-existing and what isn't….I believe it was possible something adverse would occur if I went ahead and sought treatment for it prior to my health insurance kicking in." Tr. 113.  Petitioner also explained that she sought treatment for her sinus infections in the fall of 2013 because, "that was treatable, and I knew what they were."  Tr. 114.

Petitioner testified that she called in February to schedule an appointment about her left shoulder.  Tr. 19.  Petitioner testified that when she finally had her appointment on February 20, 2014, Dr. Goff diagnosed her with an impinged shoulder after doing x-rays. Tr. 20.  Petitioner stated that at the time of the February 20, 2014 appointment, she was unable to raise her arm over her head or rotate it to put on a jacket.  Tr. 21.  Dr. Goff had recommended Diflucan, an anti-inflammatory and shoulder exercises.  *Id.*  Petitioner stated that Dr. Goff did not recommend physical therapy at the time.  *Id.*  When Dr. Goff followed up with petitioner on February 26, 2014, petitioner stated that her pain was about at a five, but the note that her symptoms and mobility were improving was accurate.  *Id.*

Petitioner testified that she was doing the exercises and stretches that Dr. Goff recommended, but after the initial improvement, her progress stalled.  Tr. 24.  She testified that Dr. Goff recommended Labrada Chiropractic for physical therapy.  *Id.*  Petitioner stated that at the initial appointment at Labrada, on July 1, 2014, she filled out the patient summary form.  Tr. 25.  She stated that the record, which indicates that her symptoms of pain and stiffness began after the flu shot was correct.  Tr. 61; *see also* Pet. Ex. 2 at 1.  Indeed, on the joint evaluation page, apparently in the therapist's handwriting it is recorded "Patient reports L shoulder pain present since last September after having a flu shot."  Pet. Ex. 2 at 1.  Further down on the same page, in the same handwriting it says, "She reports that last week she was reaching overhead to get something off a shelf that her shoulder began hurting.  *Id.*  Petitioner testified that she may have exacerbated [her left shoulder pain], when reaching overhead to pull something off a shelf, but restated that her pain began in September 2013.  Tr. 64.  Petitioner also explained that the note on the typed Claims Request Form, which indicates that the symptoms began on 07/16/2014 was incorrect.  Tr. 25.  Petitioner stated that the claim forms that all included the symptom date of 07/16/2014 were incorrect.  *Id.*

Petitioner testified that after her MRI in December 2014, she presented to orthopedic specialist, Dr. Bruce Moseley for an evaluation.  Tr. 28.  Petitioner stated that she told Dr. Moseley that her shoulder pain began after she received a flu shot in September 2013.  Tr. 29.

The petitioner also demonstrated where the flu shot in question was administered on her left arm.  Tr. 29.  She testified that the shot was administered, "not where a shot was normally placed.  It was placed much higher up on the arm, like one finger from the top of my shoulder.  Tr. 29-30.

During cross-examination, petitioner testified that she has never had any problems with the Celestone injections in the past.  Tr. 43.  She explained that after receiving the flu shot in 2013 she did not consent to receiving a shot in her left arm until 2018.  Tr. 45.

### 2.  Mr. Mark Culmer

Mr. Culmer testified that he is the domestic partner of petitioner and has known her for thirteen years.  Tr. 127.  He stated that in September 2013 he and the petitioner were dating but not living together.  Tr. 128.  Mr. Culmer testified that in September 2013 he had taken a two-week vacation to Vietnam and Cambodia, however, was still communicating with petitioner through a WhatsApp and on the phone occasionally.  Tr. 128-29.  He stated that petitioner told her she went to get a flu shot in her left arm and "she believed it was administered incorrectly because she had some severe pain in her left arm."  Tr. 129.

He testified that petitioner and he would swim quite frequently together prior to her flu vaccination in September 2013.  Tr. 130.  He stated since September 22, 2013, she has not been able to swim with him.  *Id.*  He explained that in September and October of 2013 he had to help petitioner get dressed in the morning because she could not raise her arm.  Tr. 132.  Mr. Culmer stated that petitioner also could not lift pots and pans, so he was helping her cook.  *Id.*  He also testified that petitioner had to give up running for a period of time after she received the flu vaccination in September 2013 and she was having difficulty sleeping at night because she could not sleep on her left side.  Tr. 134.

Mr. Culmer testified that Dr. Goff had been his primary care physician ("PCP") for four years.  Tr. 131.  He stated that the petitioner recommended her as a PCP when his doctor went semi-private.  *Id.*  He explained that Dr. Goff's "one malady per appointment policy," recently prevented him from being treated for both an ear infection and pain in his left knee.  Tr. 133.  He stated that when he saw Dr. Goff for his ear infection and mentioned the pain in his left knee, she told him to make a separate appointment for his knee and, "I'm only doing you today for your ear infection."  Tr. 133-34.

During cross examination, Mr. Culmer explained that three or four months after the injection petitioner was not getting better.  Tr. 152.  He stated that, "It was just as bad as it was from the onset and it was clear at that point that this was more than just something that was just a temporary injury.  This was going to be something that was going to need some treatment….to get some professional expertise on."  *Id.*  When asked if he knew how many steroid injections petitioner had received, he stated that he did not know.  Tr. 154.  Mr. Culmer stated that he could not recall another time that petitioner has received an injection.  *Id.*  He stated that he recalled the September 2013 flu vaccine because petitioner told him about the pain she was experiencing, but he could not recall another time she received an injection.  *Id.*

### 3.  Dr. Camille Goff, M.D.

Dr. Goff testified that since late 1989 she has been practicing in primary care and sports medicine.  Tr. 168.  She stated that she has been treating petitioner since before 2000 as her primary care physician.  Tr. 171.

Dr. Goff explained the "one malady per visit," rule.  Tr. 172.  She stated that she typically sees a patient for one problem at a time. *Id.*  She explained that she discerns the condition that seems to be most pressing. *Id.*  Dr. Goff gave an example, stating, "…they may come in and say,

my shoulder hurts and I have a sinus condition, and because a sinus condition is something that is a short need, then I can do something like that, but for the most part we try to do one project at a time." Tr. 173.  She stated, "Because I practice sports medicine as well as primary care, sometimes we'll tell a patient, okay, you can come in for a medical complaint or you come in for a sports medicine or an orthopedic-type complaint.  We try to separate those types of office visits unless one of the complaints is going to be something that won't take a lot of time, because office visits are 15 minutes each." Tr. 174.  Dr. Goff explained that the "one malady per visit," is not a written office policy, but it is enforced.  Tr. 175.  She testified that her staff will ask patients "which is the most pressing issue," when patients schedule appointments.  *Id.*  Dr. Goff also stated that sometimes, during the examination, a patient will list several issues and she will try to "weed out what's the most pressing issue that day." *Id.*  She stated that at times she tries to "squeeze" patients in for an appointment if they are sick and if at this type of appointment a patient complains about another issue, her office will say, "We squeezed you in for this short visit.  I'm sorry, but you will need to come back for this other condition." Tr. 176.  She testified that in those types of scenarios, the second issue may not be recorded in the medical record. *Id.*  Dr. Goff added that, "it is not a black-and-white situation every day with every patient with every problem." Tr. 201.

Dr. Goff testified that after reviewing some of petitioner's records from 2013 and 2014, her office was adopting electronic medical records ("EMR") and that, "[it's] not as complete as I wish they would be." Tr. 174.

Dr. Goff also explained that she had been giving the petitioner Celestone injections for several years as treatment for respiratory infections.  Tr. 177.  She testified that she usually gives injections in a patients' non-dominant arm.  Tr. 179.  Dr. Goff testified that she gave the petitioner a Celestone injection on October 17, 2013, but it is not documented in the medical record which arm the injection was given.  Tr. 188.  She added that she assumed the steroid injection would have been given in the non-dominant arm, but, "She could say 'Oh, that arm hurts," and we'd put it in the other one…." *Id.*  Dr. Goff noted that at an appointment from March 25, 2014, petitioner received a Celestone injection, but the arm in which the injection was administered was not recorded.  Tr. 196.  Dr. Goff also stated that this appointment date, March 25, 2014 had been inadvertently omitted from her March 1, 2017 letter, which provided dates when petitioner was treated with Celestone injection.  Tr. 196-97; *see also* Pet. Ex. 8.

When going through petitioner's medical record, Dr. Goff noted some errors in the record.  Tr. 208.  For example, at an appointment on January 19, 2016, it states that that petitioner presented for a routine physical.  Pet. Ex. 5 at 65; Tr. 208.  Dr. Goff read the record, "January 19th 2016. She apparently presented for a routine physical---no, that's not right. I don't know how that got there." Tr. 208.  The medical record also indicated that petitioner had a left shoulder exam after suffering a trip and fall.  Tr. 209; Pet. Ex. 5 at 65.  Dr. Goff noted that the record for the same appointment diagnosed petitioner with "unspecified sprain of the right shoulder," but the exam and x-ray were of the left shoulder.  Tr. 209; Pet. Ex. 5 at 65-67.  Dr. Goff also testified that she administered a Celestone injection the same day, January 19, 2016, but stated, "The only thing is if her shoulder was hurting that day, I don't know that I would have given her an injection in the left arm." Tr. 210.  The arm in which the Celestone injection was given at the appointment in January 19, 2016 was not included in the medical record.

Dr. Goff agreed that the January 19, 2016 appointment record was reflected on the letter dated March 1, 2017, where she wrote, "[Petitioner] was treated with Celestone injections on January 10, 2014, October 13, 2014, February 6, 2015, May 14, 2015, as well as, January 16, 2016.  These injections were given by myself into her nondominant arm, left deltoid."  Pet. Ex. 8; Tr. 210.  Dr. Goff, however, stated, "I must have written that in error, because I would not have given a shot in a shoulder that was hurting.  I don't do that…..So I must be in error when I wrote that letter."  Tr. 211.  She clarified, referring to the January 16, 2016 date, "So for that date of service, it must be an error."  *Id.*

Dr. Goff noted that medical records from November 30, 2018 indicated that petitioner received a Celestone injection in her right upper arm.  Pet. Ex. 33 at 52; Tr. 212.  Dr. Goff testified that the software the practice has now can document which side injections are given.  Tr. 212.

### d.  Party Contentions

In petitioner's post-hearing brief, she argues that the medical records and evidence submitted establish that the onset of her left shoulder pain began within 48 hours of her flu vaccine administered on September 22, 2013.  Pet. Response ("Pet. Brief") at 1.  Petitioner states that her testimony and affidavits regarding the onset of her left shoulder pain are consistent with what she told her treating physicians and are reflected in the medical record when she sought treatment for the injury.  Pet. Brief at 4.  Petitioner asserts, that even though the medical records from February 20, 2014, July 2, 2014, and January 13, 2015 were not prepared contemporaneously with the onset of her left shoulder pain, they are probative as to the date of onset of shoulder pain as they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions."  *Id.* at 5 (citing *Cucuras v. Sec'y of Health & Human Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Petitioner also contends that it is not surprising that she did not report left shoulder pain to her dermatologist, urologist, endocrinologist, gastroenterologist and gynecologist, as they specialize in various fields unrelated to orthopedics.  Pet. Brief at 5.  Petitioner further contends that she did not report her shoulder pain to her PCP, Dr. Goff, in October 2013 because she wanted to wait until her new health insurance policy began and the limiting "one ailment per visit" policy.  *Id.* at 5-6.  Petitioner stated that once her new policy began in January 2014, she did mention her left shoulder pain, but Dr. Goff failed to record it on the medical record.  Pet. Brief at 6.  Petitioner argues that Dr. Goff's medical records are incomplete, by her admission, and thus these records are incomplete.  *Id.*  Therefore, petitioner's testimony may be considered more persuasive than written records, where records are deemed incomplete or inaccurate.  *Id.* (citing *Campbell v. Sec'y of Health & Human Servs.,* 69 Fed. Cl. 775, 779 (2006).

Respondent argues that petitioner did not seek treatment for her alleged left shoulder pain until 151 days after the flu vaccine administered on September 22, 2013.  Resp. Brief at 9.  Respondent contends that petitioner had "more than a dozen medical encounters from the time of her flu vaccination until the date of her first report of the left shoulder pain.  It is undisputed that the medical records on *all* fourteen occasions are silent to such complaints."  *Id.* (original

emphasis).  Respondent argues that petitioner's sentiment about not wanting to seeking treatment after starting her new job and was concerned about having a pre-existing condition on a new health insurance policy are inconsistent with her "objective action to seek medical treatment during the weekdays for other ailments."  *Id.* at 9.  Respondent contends that "the sheer number of medical encounters…without a complaint of pain, must be considered when evaluating the evidence of onset in this case."  *Id.*  Respondent concludes that the preponderant evidence does not support onset of petitioner's left shoulder complaints within 48 hours of the flu vaccination. *Id.*

## IV.    Finding of Fact

The only factual issue to be determined after the hearing is the date of onset of petitioner's left shoulder pain.

The petitioner and Mr. Culmer testified credibly that petitioner experienced pain in the left shoulder within 48 hours of receiving the flu vaccine on September 22, 2013. In fact, petitioner testified that the pain began immediately after the injection.  Both their testimonies provided additional details as to why petitioner delayed treatment for the pain in her left shoulder.  Mr. Culmer explained that when he returned from his two-week vacation in October 2013, petitioner was having difficulty getting dressed and was not swimming with him anymore. Tr. 132.  He explained that they used to swim together four to five times a week and she was unable to participate after receiving the flu vaccination.  Petitioner also testified that she delayed the treatment for her shoulder because she initially thought the pain would go away on its own as she explained to Dr. Labrada at her first appointment.  Petitioner was also concerned that seeking medical treatment for a new condition would not be covered as a pre-existing condition by a new health insurance policy that was provided by her new employer.  Finally, once petitioner sought treatment for her left shoulder pain and dysfunction, she consistently informed her medical providers that her pain and dysfunction began after she received the flu vaccine on September 22, 2013.

The medical records, as respondent correctly observes, are silent to any left shoulder pain from the date of vaccination, September 22, 2013, until the February 20, 2014.  However, as petitioner stated in her post-hearing brief, some of the appointments respondent references were with specialists in other fields of medicine.  For example, petitioner had an appointment with Dr. Brian Powers, a urologist, on September 27, 2013, for a follow-up from a cystoscopy that occurred on September 13, 2013.  Pet. Ex. 23 at 4-7.  Another appointment was on January 23, 2014 with petitioner's gynecologist for a repeat test.  Pet. Ex. 25 at 6.  Consistent with petitioner's testimony, this appointment occurred *after* her new health insurance began in January 2014.  *See* Tr. 58.  Additionally, this appointment was specific to petitioner's gynecological health where her doctor would be unable to address any orthopedic issues. Petitioner also had an endoscopy for abdominal pain which was done under sedation. (Midazolam 5mg IV).

Petitioner also testified credibly that she did not report the left shoulder pain to Dr. Goff between September 22, 2013 and February 28, 2013 because she was primarily seeking treatment for recurrent sinus infections and Dr. Goff has a "one ailment per visit" policy. Tr. 76.

Dr. Goff confirmed this unofficial office policy during her testimony and stated that she "typically" sees a patient for one problem at a time. Tr. 172. She explained that she tries to pick the most pressing condition. *Id.* Further, she stated that because she practices sports medicine and primary care, she attempts to separate those types of visits, "unless one of the complaints is going to be something that won't take a lot of time." Tr. 174. Petitioner and Dr. Goff's testimony regarding the "one ailment per policy" visit was consistent with one another and provided further detail as to why an orthopedic issue would not have been discussed during a visit for treatment of a sinus infection. *See* Tr. 174.

Respondent states that "contemporaneous medical records generally should be given greater evidentiary weight than oral testimony, especially where testimony conflicts with the medical records." Resp. Brief at 8 (citing *Cucuras,* 993 F.2d at 1528). However, written records, which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent. Records which are incomplete may be entitled to less weight than records which are complete. *Murphy v. Sec'y of Health & Human Servs.,* 23 Cl. Ct. 726, 733 (1991). Further, oral testimony that is inconsistent with medical records must be consistent, clear, cogent and compelling to outweigh medical records. *Camery v. Sec'y of Health & Human Servs.,* 42 Fed. Cl. 381, 391 (1998).

In this case, petitioner's medical records from Dr. Goff and Dr. Labarada contain internal inconsistencies and are incomplete. After Dr. Goff reviewed petitioner's medical records from 2013-2014, she testified that the records were "not as complete as I wish they would be." Tr. 174. Even the more recent medical records from appointments with Dr. Goff include inconsistencies. At an appointment on July 19, 2016, petitioner had sought treatment for her left arm and hip after she suffered from a fall. Pet. Ex. 5 at 65. The physical exam and x-ray were all performed on her left arm and shoulder, however, the diagnosis was recorded as "unspecified sprain of right shoulder joint." *Id.*

The records from Dr. Labarada reference different dates as the onset of petitioner's left shoulder pain. *See* Pet. Ex. 2. For example, on the record dated July 1, 2014, it is recorded that petitioner's left shoulder pain was present "since last Sept. 2013. Began after flu shot," and in the same handwriting further down on the page, it is written, "She reports that last week she was reaching overhead to get something off a shelf and that her shoulder began hurting." Pet. Ex. 2 at 1. Later the records from Dr. Labarada, put the onset of petitioner's symptoms as "7/16/2014." Pet. Ex. 2 at 14. When petitioner was asked about the different onset dates referenced in her first appointment with Dr. Labarada, petitioner credibly testified that her shoulder pain began in September of 2013 and "maybe refired when I pulled something off a shelf." Tr. 64. Given that Dr. Labarada recorded that petitioner's left shoulder pain was present since September 2013 after the flu shot *twice* in same record, petitioner's explanation that reaching overhead to a shelf exacerbated her ongoing pain is consistent with her claim that she experienced pain in her left shoulder since receiving the flu vaccination on September 22, 2013.

The testimony provided by petitioner, Mr. Culmer, and Dr. Goff were consistent, clear, cogent and compelling, thus deserving more weight than the inconsistent and incomplete medical records.

## V.     Conclusion

I have carefully reviewed the record, including affidavits, testimony, medical records and the briefs filed by both parties.  I find that petitioner began to experience shoulder pain began immediately after the flu shot and within 48 hours after receiving the vaccination on September 22, 2013.

The parties are encouraged to resolve the remainder of this case informally.  If the parties retain any experts to opine about causation, the parties must deliver this Finding of Facts Ruling to the proposed expert.  *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415 (Fed. Cir. 1993).

Therefore, in accordance with the above, the following is hereby **ORDERED:**

1) **Within thirty (30) days, by Tuesday, November 3, 2020,** respondent shall file a status report indicating how he intends to proceed with this claim or if he will consider an informal resolution to this case.

**IT IS SO ORDERED.**

<u>**s/Thomas L. Gowen**</u>
Thomas L. Gowen
Special Master